UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
LIDYA RADIN,

                          Plaintiff,          04 Civ. 704 (RPP)

        - against -

                                **OPINION AND ORDER**

ALBERT EINSTEIN COLLEGE OF MEDICINE
OF YESHIVA UNIVERSITY, YESHIVA
UNIVERSITY, NORMAN LAMM, RICHARD
M. JOEL, DOMINICK P. PURPURA, MICHAEL J.
RIECHGOTT, TODD R. OLSON, JAMES DAVID,
JANICE O. BENNETT, COMMITTEE ON STUDENT
PROMOTIONS OF ALBERT EINSTEIN COLLEGE
OF MEDICINE 1994 TO 1998, and JOHN DOES 1 TO 50,

                          Defendants.
-------------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

      In her Amended Verified Complaint ("Am. Complaint"), filed May 20, 2004,[1] Plaintiff

Lidya Radin ("Plaintiff") asserts nineteen causes of action covering various New York common

law claims, claims of discrimination and sexual harassment under state and federal statues and

the federal Constitution, and a claim under the Racketeer Influenced and Corrupt Organizations

Act ("RICO") against Albert Einstein College of Medicine of Yeshiva University ("AECOM"),

Yeshiva University, several administrators and instructors at AECOM, and the Committee on

Student Promotions at AECOM ("Promotions Committee").  Plaintiff was a medical student at

Defendant AECOM beginning in the fall of 1994, and her claims relate to actions taken by the

Defendants in connection with: (1) Plaintiff's complaints concerning her first-year anatomy class

in 1994; (2) her placement in AECOM's Deceleration Program in April 1995 following her

failure of three classes; (3) her suspension and subsequent medical leave from AECOM in 1996;

---

      [1] The original complaint in this action was filed on January 29, 2004.

(4) her involuntary withdrawal from AECOM in January 1998; and (5) various other aspects of her educational experience at AECOM.

Defendants move for dismissal of the Am. Complaint for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and due to the Am. Complaint's excessive length and verbosity pursuant to Rule 8(a)(2) of the Federal Rules of Civil Procedure. Specifically, Defendants state that under Rule 8(a)(2) "[w]here a complaint is too verbose and lengthy as to be understood by the defendant, it should be dismissed." (Defs.' Mem. at 10 (citing United States v. Lockheed-Martin Corp., 328 F.3d 374, 376-79 (7th Cir. 2003).) Though lengthy, the Am. Complaint is intelligible, and the Court declines to dismiss the Am. Complaint under Rule 8(a)(2). However, Defendants' motion to dismiss is granted for the reasons that follow.

**BACKGROUND**[2]

A. **Parties**

Plaintiff is a Roman Catholic woman, a first-generation American of Croatian descent, and a resident of the State of New Jersey. From November 1993 until on or about January 30, 1998, Plaintiff was an applicant and matriculating student at Defendant AECOM. (Am. Compl. ¶¶ 4-5.)

Defendant AECOM is a private, not-for-profit institution of higher education, authorized by the State of New York to award the degree of medical doctor ("M.D."). Its principal office is located at 1300 Morris Park Avenue, New York, New York. (Id. ¶ 7.) Defendant AECOM is a division of Yeshiva University. (Id. ¶ 8.)

---

[2] The facts that follow are taken from the Am. Complaint, and for the purposes of this motion, these facts are assumed as true, except in those instances when the documents cited in the Am. Complaint have been supplied by Defendants and contradict or supplement the facts alleged in the Am. Complaint. See Defs.' Notice of Mot. to Dismiss, dated July 14, 2004, Exs. B-G; see also Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000); Schnall v. Marine Midland Bank, 225 F.3d 263, 266 (2d Cir. 2000).

Defendant Yeshiva University is a private, independent institution of higher education chartered under the laws of New York, and its principal office is located at Joel Jablonski Campus, 500 West 185th Street, New York, New York.  (Id. ¶ 9.)

Defendant Rabbi Dr. Norman Lamm, "at all times mentioned," was the President of Yeshiva University and is a resident of the State of New York.  (Id. ¶ 11.)

Defendant Richard M. Joel succeeded Rabbi Dr. Lamm in 2002 as the President of Yeshiva University and is a resident of the State of New York.  (Id. ¶ 12.)

Defendant Dr. Dominick P. Purpura, "at all times mentioned," was and is the Dean of AECOM and is a resident of the State of New York.  (Id. ¶ 13.)

Defendant Dr. Michael J. Reichgott, "at all times mentioned," was the Associate Dean for Students and Graduate Medical Education at AECOM and is currently the Associate Dean for Clinical Affairs & Graduate Medical Education at AECOM.  He served as co-chair and a non-voting member of Defendant Promotions Committee from 1994 to 1998.  He is a resident of the State of New York.  (Id. ¶¶ 14-16.)

Defendant Todd Olson, Ph.D., "at all times mentioned," was and is the lead course instructor for Defendant AECOM's first-year anatomy course and anatomy lab, which Plaintiff took during the 1994-1995 academic year at Defendant AECOM.  Olson was a voting member of Defendant Promotions Committee "at all times mentioned."  He is a resident of the State of New York.  (Id. ¶¶ 18-19.)

Defendant Dr. James David, "at all times mentioned," was and is a psychiatrist and Associate Professor of Clinical Psychiatry in Defendant AECOM's M.D. program and is currently the Associate Dean for Students at Defendant AECOM.  Dr. David was a voting

member of Defendant Promotions Committee "at all times mentioned." He is a resident of the State of New York. (Id. ¶¶ 21-23.)

Defendant Janice O. Bennett, "at all times mentioned," was a psychologist and clinical instructor in Defendant AECOM's M.D. program and was supervised by Defendant Dr. David. She was a voting member of Defendant Promotions Committee "at all times mentioned." She is a resident of the State of New York. (Id. ¶¶ 25-26.)[3]

Defendant Lloyd Greenberg, "at all times mentioned," was and is the Finance Officer at Defendant AECOM and is a resident of the State of New York. (Id. ¶ 28.)

Defendant Zoe Brown Weissman, "at all times mentioned," was and is the Director of the Cognitive Skills Office at Defendant AECOM and was a non-voting member of Defendant Promotions Committee. Weissman is a resident of the State of New York. (Id. ¶¶ 30-31.)

Defendant Committee on Student Promotions at Defendant AECOM was the Faculty-Student Committee charged with reviewing, making and executing decisions concerning Plaintiff's academic progress from August 1994 through Plaintiff's involuntary withdrawal effective on or about January 30, 1998. (Id. ¶¶ 33-34.) Excerpts of the By-Laws of the Committee on Student Promotions for the 1997-1998 academic year are provided in Exhibit C to Defendants' Notice of Motion to Dismiss, dated July 14, 2004.

**B. Facts**

Defendant AECOM accepted Plaintiff into its Fall 1994 M.D. Program as a student with minority status based on her socioeconomic disadvantaged background. (Id. ¶ 39.) After her acceptance, Plaintiff paid a deposit to Defendant AECOM and in August 1994, enrolled as a matriculating medical student in the Class of 1998. (Id. ¶ 41.) Plaintiff was thirty-four years of

---

[3] The Am. Complaint contains a paragraph numbering error. There is a paragraph numbered 1 between paragraphs 23 and 24. This opinion lists the numbers of the paragraphs as they are listed in the Am. Complaint and does not renumber all of the paragraphs in light of this error.

age at the time. (Id. ¶ 42.) Prior to her matriculation, Plaintiff sold her automobile based on representations by Defendant Greenberg that she had to sell her car in order to obtain student loans. (Id. ¶¶ 52-53.)

In the fall of 1994, Plaintiff was enrolled in the first-year anatomy course, which included an anatomy dissection lab. (Id. ¶ 55.) Defendant Olson was the course leader for both the course and the lab. (Id. ¶ 56.) Plaintiff formed a lab group with a woman, Robin Pattin, and, "without consulting with or the consent of Plaintiff and Robin Pattin," Defendant Olson arranged for a male, Kevin Reilly, to join Plaintiff's lab group. (Id. ¶ 59.) Shortly after Mr. Reilly joined the group, Plaintiff complained to Defendants AECOM and Olson that Mr. Reilly had made racist and sexist comments, which were disruptive to their group and others. (Id. ¶ 60.) Defendants AECOM and Olson spoke with Mr. Reilly about Plaintiff's complaint, and Mr. Reilly later told Plaintiff that his remarks were characterized by Defendant AECOM as a "unique brand of caustic humor that Plaintiff had failed to fully appreciate." (Id. ¶ 61.)

Plaintiff also informed Defendants Reichgott, Olson, Bennett and Weissman that Plaintiff's anatomy lab partners used the "parasite method" of lab work, a form of professional misconduct, and that she wished to transfer into another lab group where professional misconduct was not an issue. (Id. ¶¶ 62-63.) Although Defendant Olson allowed other white, male, Orthodox Jewish students to change lab groups and receive assistance, he refused to allow Plaintiff to change groups or receive the assistance of other anatomy lab professors or other groups. (Id. ¶ 64.)

In addition, "contrary to defendant AECOM's published policy on Student Professional Misconduct in defendant AECOM's Bulletin and Compendium,"[4] Defendants required that Plaintiff and her lab partners meet with Defendant Bennett and participate in mandatory psychological treatment "that was not directly related to academic instruction in anatomy, not in Plaintiff's best interest, and against the wishes of Plaintiff and her lab partner Robin Pattin." (Id. ¶ 68.) Despite the express refusals of Plaintiff and Ms. Pattin, Defendants denied Plaintiff or Ms. Pattin their rights to refuse psychological counseling "that was not directly related to their academic instruction or that was not in their best interest." (Id. ¶ 70.)

During a meeting or exchange between Plaintiff and Defendant Olson to resolve the professional misconduct issue, Defendant Olson "threatened to 'get' Plaintiff at some point during her medical school time or medical career without her knowing that the retaliation came from him," and he later admitted to threatening Plaintiff. (Id. ¶¶ 71-72.) Plaintiff informed Defendants AECOM, Reichgott, Olson, Bennett, Weissman and Promotions Committee that the actions of her anatomy lab partners and Olson's refusal to allow her to change lab groups forced her to work alone on much of her lab work, which would and did cause her to fall behind in all her other classes. (Id. ¶¶ 73-74.)

Plaintiff failed her Genetics final exam in mid-February 1995 and her Embryology final exam and her Biochemistry final exam in mid-March 1995. (Id. ¶¶ 79-80.)

In or around April 1995, Plaintiff received a letter from Defendants that indicated she would be placed in AECOM's Deceleration Program. (Id. ¶¶ 81, 154.) This letter stated that Plaintiff would be placed on an adjusted academic schedule, would have a reduced course load, and would graduate in five rather than four years. (Id. ¶ 155.) Defendants represented that

---

[4] Excerpts from "A Compendium of Information on Examinations, Grades and Promotions 1995-1996," attached as Exhibit B to Defendants Notice of Motion to Dismiss, set forth the text of AECOM's applicable policy relating to allegations of student professional misconduct.

Plaintiff had ten days to decide whether to proceed in the Deceleration Program or appeal. (Id. ¶ 156.) Plaintiff signed the letter, indicating that she agreed to her placement in the Deceleration Program, and returned the letter to Defendant Reichgott. (Id. ¶¶ 82, 158.) In or about April 1995, an ad hoc subcommittee of the Promotions Committee "summoned Plaintiff to meet with it." (Id. ¶ 84.) During the meeting on or about April 10, 1995, they discussed Plaintiff's placement into the Deceleration Program and produced a three-page report, including a four-point plan, which concerned management of Plaintiff's placement in the Deceleration Program. (Id. ¶¶ 85, 159, 163.) The four-point plan included:

    (a)  Plaintiff's study plans and habits should be reviewed by a faculty member in the first curriculum with the goal of offering guidance and advice;

    (b)  Plaintiff's performance should be periodically monitored;

    (c)  A mentor can be assigned if the Plaintiff agrees; and

    (d)  any contacts with the faculty, including defendant Bennett should provide a forum for Plaintiff to review her handling of current medical school difficulties and whether she's using necessary support systems.

(Id. ¶ 163.)

The Am. Complaint alleges that Plaintiff was never provided with a faculty advisor (id. ¶ 161), but also alleges that "defendant Reichgott claimed he undertook the role of the faculty advisor to Plaintiff upon her entry into defendant AECOM's Deceleration Program in April 1995" (id. ¶ 224).[5] In or about April 1995, Defendant Reichgott met with Plaintiff and discussed her placement in the Deceleration Program. (Id. ¶ 88.)

From June 1995 through May 1996, Plaintiff worked on her Graduation Research Project at Long Island Jewish Medical Center ("LIJ"), an affiliate teaching hospital of Defendant AECOM, with Dr. William Rennie. (Id. ¶ 92.)

---

[5] Plaintiff alleges that "Defendant Reichgott breached [his duty as a faculty advisor] by failing" to perform certain tasks. (Am. Compl. ¶ 226.)

In or about August 1995, Defendant Reichgott met with Plaintiff, upon Plaintiff's request "for direction regarding implementation of her placement in the Deceleration Program." (Id. ¶ 93.) Defendant Reichgott prepared a half-page memo concerning Plaintiff's placement in the Deceleration Program, including a course schedule for Plaintiff. (Id. ¶ 94.) The schedule was for two academic years, 1995-1996 and 1996-1997, and indicated that Plaintiff would retake the three courses she failed in her first year, Genetics, Embryology and Biochemistry, and take two second-year courses, Infectious Diseases and Parasitology. (Id. ¶ 165.) Also, Plaintiff optionally could take the second-year course, Physical Diagnosis, which she declined to take in September 1995, after she learned that Physical Diagnosis had two co-requisites that she had not taken. (Id. ¶ 166.)

By email on January 5, 1996, Plaintiff informed Defendants that the course and exam schedules of the two second-year courses she was supposed to take conflicted with the course and exam schedules of the three first-year classes she had to retake. (Id. ¶ 167.) In an email dated January 9, 1996, Defendants modified Plaintiff's schedule by informing her that her first priority was to successfully complete the first-year courses she was taking and, in accordance with published AECOM policies, that she would have to wait until the following year to take the second-year courses if they conflicted.[6] (Id. ¶ 168.) Plaintiff, independently of Defendant Reichgott, arranged for tutoring services through the Office of Defendant Weissman. (Id. ¶ 95.) At some point, Defendant Weismann forced Plaintiff out of her Biochemistry tutoring group, and she was left without tutoring services for four to six weeks. (Id.)

On or about May 14, 1996, Plaintiff had a discussion with Dr. Rennie, who informed her that in the fall of 1995 Defendant Olson told him that Defendants had diagnosed Plaintiff as having a personality disorder. (Id. ¶ 99.) On May 14, 1996, Plaintiff wrote an email to

---

[6] It appears that Defendant Reichgott modified Plaintiff's schedule. (See id. ¶ 95.)

Defendant Reichgott, which the Am. Complaint characterizes as "object[ing] to the way defendants had misled her about the nature of defendants' M.D. degree program, mismanaged her medical school program, 'diagnosed' her without her knowledge and consent, and defamed Plaintiff."[7] (Id. ¶ 100.)  Plaintiff placed a printed copy of this email under the office door of Defendant Reichgott on or about the evening of May 14, 1996.  (Id. ¶ 102.)

In or about mid-May 1996, after the discussion with Dr. Rennie and the May 14, 1996 email, Plaintiff "was coerced by two people, working on behalf of and in concert with AECOM, to go to a hospital emergency room to address Plaintiff's concerns about episodes of harassment she experienced in connection with dealing with defendants, and Plaintiff eventually was admitted to an affiliate of that hospital."  (Id. ¶ 104.)  Plaintiff also asserts that in May 1996 she inhaled a patient's blood, became ill, and had no real access to medical care.  (Id. ¶ 58.)

On or about May 21, 1996, Defendants locked Plaintiff out of her apartment on Defendant AECOM's campus.[8] (Id. ¶¶ 105, 180(a).)  On May 22, 1996, Plaintiff was suspended from AECOM.  (Id. ¶¶ 106, 180(b).)  The Am. Complaint alleges that Defendants "failed to give Plaintiff her right to appeal the suspension."  (Id. ¶ 180(b).)  In or about June 1996, Defendants placed Plaintiff on medical leave and stated that this leave was pursuant to AECOM's psychiatric policy.[9] (Id. ¶¶ 109, 294.)  Plaintiff made no written request for a leave, nor was she given an opportunity to appeal.  (Id. ¶ 180(c).)  Defendant Reichgott falsely told the Promotions

_____

[7] Although Plaintiff's email does contain complaints concerning the lack of privacy at AECOM and the conduct of professors and other students, the majority of the email consists of threats directed toward AECOM and Defendant Reichgott and contains numerous expletives and epithets.  (See Defs.' Notice of Mot. to Dismiss Ex. D.)

[8] Plaintiff also alleges that this housing had been noisy and detrimental to studying or sleeping.  (Am. Compl. ¶¶ 54, 271(a).)

[9] Exhibit C to Defendants' Notice of Motion to Dismiss contains excerpts from Appendix III: Guidelines for Academic Status of Students with Psychiatric Illness, which is part of AECOM's A Student Guide to Academic Resources, Academic Committees, Academic Procedures & Policies 1997-1998 ("1997-1998 Student Guide").

Committee that Plaintiff had requested a leave of absence and that Plaintiff had indicated that she did not intend to return to AECOM for the 1996-1997 academic year.  (Id. ¶ 111.)

After Plaintiff's suspension in May 1996 and for the next one and a half years, Plaintiff sought a hearing to contest her "involuntary withdrawal" from AECOM.  (Id. ¶ 113.)  The Am. Complaint alleges that in or about June 1996, Defendants informed Plaintiff in writing that Defendants would reconsider her reinstatement and Defendants' recommendation of involuntary withdrawal if she agreed (1) "to admit in writing that she had a psychiatric illness"; (2) to consent to Defendants "obtaining medical records from her treating physician"; (3) to "submit to examination by a psychiatrist on the faculty of defendant AECOM and chosen by defendants to evaluate her"; and (4) to sign "a contract agreeing to hold the psychiatrist and defendants harmless and free from all liability and prior to the results of any evaluation."[10]  (Id. ¶¶ 144-45.) "Plaintiff refused to agree to hold defendants and the psychiatrist harmless and free from all liability prior to an evaluation, without any prior admission that she suffered from a psychiatric illness and without releasing her records."  (Id. ¶ 146.)  Plaintiff based this "refusal to consent and agree upon the fact that [she] had no treating physician, was unafflicted by mental illness, defect or disease, and that there was no question that Plaintiff was not properly admitted to the hospital during her brief stay in May 1996."  (Id. ¶ 147.)

In or about June 1996, Plaintiff received notice from Dr. Rennie and the chairman of LIJ's Emergency Medical Department that she would be removed from her Graduation Research Project and given minimal credit for her participation.  (Id.  ¶ 258.)

On June 21, 1996, Plaintiff met with Defendant Reichgott to discuss how her loans would be handled during her suspension.  His response was "dismissive."  (Id. ¶ 134.)

---

[10]  Exhibit F to Defendants' Notice of Motion to Dismiss is a copy of the letter to Plaintiff from Defendant Reichgott, dated June 17, 1996, setting forth the exact text of the communication to Plaintiff.

In or about December 1996, Defendants "placed Plaintiff on an extended medical leave without written notice to or a written request from Plaintiff or an opportunity to appeal this forced separation from her school." (Id. ¶ 180(d).)

In or about December 1996 or January 1997, "AECOM caused Plaintiff's school loans to come due." (Id. ¶ 137.) From January 1997 through July 28, 1997, Defendant Greenberg, AECOM's Finance Officer, refused to communicate with Plaintiff about her student loans or billing charges, except when Defendant Greenberg informed Plaintiff by a letter dated July 3, 1997, that he had determined he had no obligation to Plaintiff as she was not enrolled in classes. (Id. ¶ 138.)[11]

On or before January 10, 1997, Defendants knew that Plaintiff had applied for a transfer to the M.D. program at Albany Medical College. (Id. ¶ 250.) In connection with Plaintiff's transfer application, Defendants sent a letter to the Albany Medical College that omitted certain complimentary information, over the objections of Plaintiff and her attorney.[12] (Id. ¶ 253.) In January 1997, Dr. Rennie provided a "marginal" letter of recommendation to Albany Medical College in connection with Plaintiff's transfer application. (Id. ¶ 258.) On or about February or March 1997, Plaintiff received notice from Albany Medical College that the College had denied her transfer application, even though she had been accepted when she applied in the 1993-1994 application year. (Id. ¶ 259.)

In or about August 1997, Defendants recommended Plaintiff's involuntary withdrawal from Defendant AECOM. (Id. ¶¶ 112, 180(f).) The decision of the Promotions Committee to

_____

[11] Although named in the Am. Complaint, Mr. Greenberg is not listed in the caption.
[12] According to Plaintiff's current counsel, Plaintiff first retained an attorney in connection with this matter in August 1996 and was represented by an attorney in or about December 1998. (Transcript of Oral Argument on Mar. 17, 2005 ("Tr.") at 39-40, 62.)
A copy of Defendants' January 10, 1997 letter to Albany Medical College is attached as Exhibit E to Defendants' Notice of Motion to Dismiss. The letter is written by Defendant Reichgott.

involuntarily withdraw Plaintiff was made without the knowledge or participation of Plaintiff and communicated to Plaintiff by Defendant Reichgott.  (Id. ¶ 116.)  In or about October 1997, Defendants held a hearing concerning "Plaintiff's appeal of the decision that she be involuntarily withdrawn."[13]  (Id. ¶ 114.)  Defendant Reichgott admitted that he "improperly lobbied" the Promotions Committee members to sustain Plaintiff's involuntary withdrawal.  (Id. ¶ 115.)

"On or about January 3, 1997, October 6, 1997 and December 1, 1997 Plaintiff informed defendants that defendants were engaged in persistent behavior that improperly provided professional advantages to a younger, white Orthodox Jewish male who was a similarly situated classmate of Plaintiff in the Deceleration Program at the same time as Plaintiff."  (Id. ¶ 181.)  On the above dates, "Plaintiff informed defendants that such persistent behavior on the part of defendants denied Plaintiff equal consideration, acknowledgement or access to educational or professional opportunities on the basis of her gender, age and religious beliefs."  (Id. ¶ 182.)

On December 1, 1997, Plaintiff met with Defendant Purpura to appeal Plaintiff's involuntary withdrawal.  (Id. ¶ 370.)  In or about December 1997, Defendants again informed Plaintiff in writing that they would reconsider Defendants' recommendation of involuntary withdrawal under the same terms as described in the June 1997 writing, except that, after protests by Plaintiff and her attorney, Defendants had changed the psychiatric evaluation requirement to permit Plaintiff to choose the psychiatrist from a list of three psychiatrists chosen by Defendants. (Id. ¶ 144.)  "Plaintiff refused to agree to hold defendants and the psychiatrist harmless and free from all liability prior to an evaluation, without any prior admission that she suffered from a psychiatric illness and without releasing her records" (id. ¶ 146), and "based her refusal to consent and agree upon the fact that Plaintiff had no treating physician, was unafflicted by

_____

[13] It is unclear whether this is the same hearing referred to in paragraph 113.  (Am. Compl. ¶ 113 ("In or about the Fall 1997, Plaintiff was finally given a hearing at AECOM" to contest her involuntary withdrawal.).)

mental illness, defect or disease, and that there was no question that Plaintiff was not properly admitted to the hospital during her brief stay in May 1996" (id. ¶ 147).

On January 30, 1998, Defendant Purpura affirmed the Defendants' recommendation of involuntary withdrawal of Plaintiff by letter. (Id. ¶¶ 116, 148.)

The Am. Complaint alleges that "at all times" Plaintiff and her counsel were not allowed to "review all of Plaintiff's AECOM records" (id. ¶ 126) and that Defendants maintained an "official" and a "non-official file" (id. ¶ 127). Plaintiff also sought to correct her records at AECOM and "at all times" Defendants refused to permit her or her counsel to "correct all of Plaintiff's AECOM records." (Id. ¶ 131.) After June 21, 1996, Defendants Reichgott and Greenberg refused to provide Plaintiff with information about how to handle her school loans despite repeated inquires. (Id. ¶¶ 134-35.) From in or about the summer of 2002 to June 2003, "Plaintiff contacted and worked with John Austin of the New York Higher Education Services Corporation in order to have her billing and financial aid questions answered." (Id. ¶ 140.) "AECOM refused to respond to Mr. Austin for more than six months," until a June 2003 letter from Defendant Greenberg, in which he" refused to explain Plaintiff's bills or provide her with a rent refund." (Id. ¶ 142.)

## DISCUSSION

### A. **Standard of Review**

In reviewing a motion to dismiss under Rule 12(b)(6), a court must limit its review to the complaint, documents attached or incorporated by reference thereto, and "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." Rothman, 220 F.3d at 88; see also Schnall, 225 F.3d at 266.

A court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff.  Schnall, 225 F.3d at 266.  Legal conclusions, however, are not presumed to be true.  First Nat'l Bank v. Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir. 1994), cert. denied, 513 U.S. 1079, 115 S.Ct. 728 (1995).  "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995) (internal quotation marks omitted).  A court may not dismiss a complaint under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957) (footnote omitted).

## B.  Causes of Action[14]

### 1.  Breach of Contract

The first three causes of action of the Am. Complaint allege common law breach of contract claims against Defendants.[15]  The first cause of action covers various allegations of breach of contract in connection with Defendants' actions from the fall of 1994 until June 2003.

---

[14]  The Am. Complaint asserts that this Court has jurisdiction over the federal claims under 28 U.S.C. § 1331 (federal question) and over the state law claims under 28 U.S.C. § 1332 (diversity of citizenship) and 28 U.S.C. § 1367 (supplemental).  (Am. Compl. ¶ 1.)  When a federal court is sitting in diversity jurisdiction, a court must apply the substantive law of the forum state.  Eternity Global Master Fund v. Morgan Guar. Trust, 375 F.3d 168, 177 n.23 (2d Cir. 2004).  In applying supplemental jurisdiction, federal courts must apply the forum state's substantive law to the state claims.  Promisel v. First American Artificial Flowers, 943 F.2d 251, 257 (2d Cir. 1991).  New York choice of law rules require courts to apply the law of the state that has the most "significant contacts with the matter in dispute."  Auten v. Auten, 308 N.Y. 155, 160 (1954); see also Matter of Allstate Ins. Co. (Stolarz), 81 N.Y.2d 219 (1993).  In this case, all of the allegations concern actions taken by Defendants in New York and all of the Defendants are residents of the State of New York.  Therefore, this Court applies New York state law to Plaintiff's state claims and federal law to Plaintiff's federal claims.

[15]  The fourth breach of contract claim alleges that AECOM breached its fiduciary duty to Plaintiff, which was created by AECOM's administration of financial aid programs in accordance with the Higher Education Act ("HEA") and its implementing regulations.  (Am. Compl. ¶¶ 187-193.)  This claim will be addressed in the breach of fiduciary duty section.  See infra pp. 27-28.

The Am. Complaint also asserts related claims of recission (fifth), breach of good faith and fair dealing (seventh), and breach of quasi-contract and unjust enrichment (nineteenth).  These claims are dismissed for the same reasons as the breach of contract claims.

(Am. Compl. ¶¶ 36-152.)  The allegations in the first group of claims for breach of contract encompass claims in the following areas: (1) Defendants' conduct related to Plaintiff's first-year anatomy course and lab in the fall of 1994 (id. ¶¶ 59-80); (2) Defendants' conduct related to Plaintiff's participation in the Deceleration Program and tutoring services from April 1995 to May 1996 (id. ¶¶ 81-96); (3) Defendants' suspension of Plaintiff in May 1996 and subsequent leave of absence from May 1996 to August 1997 (id. ¶¶ 97-111); (4) Defendants' involuntary withdrawal of Plaintiff from AECOM, which occurred on January 30, 1998 (id. ¶¶ 112-120); (5) AECOM's provision of inadequate student housing to Plaintiff (id. ¶ 54); (6) AECOM's violation of Plaintiff's privacy rights relating to her health information, which caused her to have "no real access to medical care in May 1996 when she inhaled a patient's blood and became ill" (id. ¶¶ 57-58); (7) AECOM's alleged violation of its policy condemning sexual discrimination (id. ¶¶ 48, 121-123);[16] (8) AECOM's refusal to allow Plaintiff to review and correct all of her records "at all times mentioned" (id. ¶¶ 124-33); and (9) AECOM's refusal to provide Plaintiff with financial records from June 1996 to June 2003 (id. ¶¶ 134-43).  The second group of breach of contract claims focuses on AECOM's administration of the Deceleration Program (id. ¶¶ 154-74), while the third group of breach of contract claims centers around AECOM's mental diagnosis of Plaintiff and discrimination against Plaintiff (id. ¶¶ 176-85).

Defendants contend that Plaintiff's claims of breach of contract are challenges to their academic and administrative determinations regarding Plaintiff, which were necessary to their administration of an academic institution, and as such, could only be asserted in a proceeding pursuant to Article 78 of New York's Civil Practice Law and Rules, which has a four-month

---

[16] Plaintiff alleges claims for gender, age, religious and ethnic origin discrimination under New York State Human Rights Laws (fifteenth cause of action) and Title IX & § 1983 (seventeenth cause of action).  These claims are addressed infra, pp. 31, 33-38.

statute of limitations. (Defs.' Mem. at 18.) Thus, Defendants argue all of Plaintiff's claims are time barred.

Plaintiff responds that an Article 78 proceeding is not appropriate because: (1) this case involves a conspiracy by the Defendants to impose, in the guise of an administrative procedure, a mental diagnosis on Plaintiff, breaching the contract between Plaintiff and AECOM (a "cause of action" not included in the Am. Complaint); (2) there were "no academic issues in Ms. Radin's case," and "[e]ven if there were, academic determinations are not subject to judicial review"; (3) AECOM chose an "unsuitable policy" to "apply to Ms. Radin's circumstance," and "[t]here is no precedent for a Court in an Article 78 review to discard an inappropriately chosen policy and substitute a more correct policy"; and (4) Plaintiff is seeking monetary relief, which is not available in an Article 78 proceeding.[17] (Pl.'s Mem. at 18-20.) Plaintiff then argues that a breach of contract claim is the appropriate vehicle for these claims and that AECOM's various bulletins, compendia and regulations, which Defendants allegedly violated, provided the terms for an implied contract between Plaintiff and Defendant AECOM. (Id. at 20-21.)

Defendants respond that even if Plaintiff's claims were not time barred, the pleadings constitute claims of educational malpractice, as they do not identify any specific promise that AECOM failed to keep but rather make general allegations that AECOM violated its policies and

___

[17] Plaintiff also argues that there was "no final, administrative determination made by neutral objective hearing body" and therefore, an Article 78 proceeding is inappropriate. (Pl.'s Mem. at 18 (citing Coffran v. Bd. of Trustees of New York City Pension Fund, 842 F. Supp. 723 (S.D.N.Y. 1994), rev'd on other grounds, 46 F.3d 3 (2d Cir. 1995).) The Am. Complaint alleges that Plaintiff was involuntarily withdrawn on January 30, 1998 by a letter from Dean Purpura, and does not allege that any further procedure was necessary. (Am. Compl. ¶¶ 116, 148.) Defendants have provided excerpts from Appendix I: By-Laws of the Committee on Student Promotions from the 1997-1998 Student Guide, which state that the "Dean alone may withdraw a student permanently from the College of Medicine." (Defs.' Notice of Mot. to Dismiss Ex. C ¶ II.D.) This 1997-1998 Student Guide is incorporated in the Am. Complaint as the Am. Complaint cites to AECOM's Bulletin, Student Guide, Compendium and the written rules and procedures of Defendant Promotions Committee. Therefore, there was a final administrative determination as to Plaintiff's involuntary withdrawal from Defendant AECOM.

procedures.  (Defs.' Mem. at 18.)  In addition, Defendants argue that the pleadings take issue

with AECOM's application of its procedures but cannot show any violation of its procedures

because AECOM substantially complied with its procedures.  Therefore, Defendants contend

these claims must be dismissed because New York courts do not recognize claims for

educational malpractice.

Federal district courts in this district and New York state courts have recognized that an

implied contract arises between a student and a university once the student is admitted to the

university.  See Chira v. Columbia Univ., 289 F. Supp. 2d 477, 485 (S.D.N.Y. 2003); Mostaghim

v. Fashion Inst. of Tech., No. 01 Civ. 8090, 2002 WL 1339098, at *6 (S.D.N.Y. June 19, 2002);

Ward v. New York Univ., No. 99 Civ. 8733, 2000 WL 1448641, at *3 (S.D.N.Y. Sept. 28,

2000); Gally v. Columbia Univ., 22 F. Supp. 2d 199, 206 (S.D.N.Y. 1998) (citing Clarke v.

Trustees of Columbia Univ., No. 95 Civ. 10627, 1996 WL 609271, at *5 (S.D.N.Y. Oct. 23,

1996)); Keles v. New York Univ., No. 91 Civ. 7457, 1994 WL 119525, at *4-5 (S.D.N.Y. Apr.

6, 1994), aff'd, 54 F.3d 766 (2d Cir. 1995), cert. denied, 516 U.S. 943 (1995); Ansari v. New

York Univ., No. 96 Civ. 5280, 1997 WL 257473, at *3 (S.D.N.Y. May 16, 1997) (citing

Paladino v. Adelphi Univ., 89 A.D.2d 85, 454 N.Y.S.2d 868 (2d Dep't 1982)); Olsson v. Bd. of

Higher Educ., 49 N.Y.2d 408, 413-14 (N.Y. 1980); Vought v. Teachers Coll., Columbia Univ.,

127 A.D.2d 654, 511 N.Y.S.2d 880, 881 (2d Dep't 1987)).

Implicit in the implied contract between the student and the university are the obligation

of the university to act in good faith when dealing with the student and the student's obligation to

satisfy the university's academic requirements and to comply with the institution's procedures if

she wishes to receive her degree.  Gally, 22 F. Supp. 2d at 206 (citing Olsson, 49 N.Y.2d at 414).

The terms of the implied contract are "supplied by the [school's] bulletins, circulars and regulations made available to the student." Id. (citing Clarke, 1996 WL 609271, at *5 (citing Vought, 127 A.D.2d at 655, 511 N.Y.S.2d at 881)).  However, to state a valid claim for a breach of contract, a plaintiff must state when and how the defendant breached the specific contractual promise.  "[T]he mere allegation of mistreatment without identification of a specific breached promise or obligation does not state a claim on which relief can be granted." Gally, 22 F. Supp. 2d at 207; see also Chira, 289 F. Supp. 2d at 486; Ward, 2000 WL 1448641, at *3 ("[B]ald assertions and conclusory allegations that the University's rules or procedures were not followed, do not state a valid claim."); Maas v. Cornell Univ., 94 N.Y.2d 87, 93 (N.Y. 1999) ("When a complaint merely 'recites a litany of academic and administrative grievances couched in terms of a violation of a contractual right to tenure' and is devoid of any reference to the contractual basis for the rights asserted, academic prerogatives should not be channeled into a cognizable contract action classification."); Baldridge v. State, 293 A.D.2d 941, 740 N.Y.S. 2d 723, 725 (3d Dep't 2002) ("[W]hile a school may be subject to a cause of action for breach of contract, this requires a contract which provides for 'certain specified services' as 'courts have quite properly exercised the utmost restraint applying traditional legal rules to disputes within the academic community'" (citations omitted)).

Thus, "if the contract with the school were to provide for certain specified services, such as for example, a designated number of hours of instruction, and the school failed to meet its obligation, then a contract action with appropriate consequential damages might be viable." Paladino, 89 A.D.2d at 92, 454 N.Y.S.2d at 873; see also Ansari, 1997 WL 257473, at *3 (refusing to dismiss a breach of contract claim because the allegations that defendants promised

state-of-the-art facilities, faculty tutor-advisors, and other identified promises were allegations of promises for specified services).

However, a breach of contract claim is not the appropriate cause of action for every dispute. The New York Court of Appeals has stated that "[c]ourts retain a 'restricted role' in dealing with and reviewing controversies involving colleges and universities" and that "CPLR article 78 proceedings are the appropriate vehicle" for such controversies. Maas, 94 N.Y.2d at 92. Under New York law, when a complaint alleges that a school breached its agreement with a student by failing to provide an effective education, the complaint must be dismissed because it asserts an impermissible claim for educational malpractice. Gally, 22 F. Supp. 2d at 206-07. New York's refusal to recognize an educational malpractice cause of action is based on "courts' reluctance to make judgments as to the validity of broad educational policies" or "sit in review of the day-to-day implementation of these policies." Ansari, 1997 WL 257473, at * 2 (internal quotation marks and citations omitted). Thus, review of academic and administrative decisions at private educational institutions has been limited to Article 78 proceedings. Id. (noting that the following academic decisions are reviewed in Article 78 proceedings: "grading disputes, dismissals, expulsions, suspensions, and decisions regarding whether a student has fulfilled the requirements for graduation.")

Although New York courts have "traditionally reviewed the actions of private institutions of higher education where it is alleged that in its relations with the students or faculty the institution has failed to follow its own hearing of review procedures," it is unclear whether claims of this nature support a cause of action for breach of contract. Gertler v. Goodgold, 107 A.D.2d 481, 487, 487 N.Y.S.2d 565 (1st Dep't 1985) (citing Matter of Carr v. St. John's Univ., 17 A.D.2d 632, 231 N.Y.S.2d 410 (2d Dep't 1962)(reviewing Article 78 proceeding), aff'd, 12

N.Y.2d 802 (N.Y. 1962); Matter of Kwiatkowski v. Ithaca Coll., 82 Misc. 2d 43 (N.Y. Sup. Ct. 1975)(Article 78 proceeding)).  The New York Court of Appeals has held that "when a university has adopted a rule or guideline establishing the procedure to be followed in relation to suspension or expulsion that procedure must be substantially observed."  Tedeschi v. Wagner Coll., 49 N.Y.2d 652, 660 (N.Y. 1980).  However, the Court stated that the "[c]ontract theory is not wholly satisfactory" and did not decide whether this holding emerged under a contract theory.  Id. at 659; see also Maas, 94 N.Y.2d at 94-95.

It is unnecessary for this Court to decide whether most of the allegations in the Am. Complaint, such as the formation of Plaintiff's anatomy lab group, the refusal to transfer Plaintiff to a different lab group, and AECOM's administration of the Deceleration Program, constitute valid breach of contract claims because this action was filed on January 29, 2004, and thus, the only claims that are not barred by the six-year breach of contract statute of limitations involve acts of the Defendants occurring after January 29, 1998.[18]  Therefore, this Court will only address the Am. Complaint's breach of contract claims relating to Defendants' involuntary withdrawal of Plaintiff and Defendants' actions in relation to Plaintiff's attempts to review and correct her records after January 29, 1998.

The Am. Complaint does not contain an allegation that Defendant AECOM breached any particular obligation or promise made to Plaintiff that would provide a basis for a breach of contract claim in connection with AECOM's decision to involuntarily withdraw Plaintiff. Instead, the Am. Complaint pleads generally that Defendants "failed to adhere to the rules and requirements specified in defendant AECOM's Bulletin, Student Guide, Compendium and the

---

[18] Additionally, Plaintiff's breach of contract claims based on AECOM's anti-discrimination policy do not state valid claims because "broad pronouncements of the University's compliance with existing anti-discrimination laws, promising equitable treatment of all students . . . cannot form the basis for a breach of contract claim."  Ward, 2000 WL 1448641, at *4; see also Spychalsky v. Sullivan, No. Civ. 010958, 2003 WL 22071602, *14 (E.D.N.Y. Aug. 29, 2003).

written rules and procedures of defendant Committee of Student Promotions."  (Am. Compl. ¶ 149; <u>see also</u> <u>id.</u> ¶¶ 117-18, 151.)  Thus, even accepting all of Plaintiff's factual allegations as true and drawing all reasonable inferences in her favor, the Am. Complaint fails to state a valid claim for breach of contract based on these broad, non-specific allegations of violations of AECOM's policies and procedures.  <u>See</u> <u>Gally</u>, 22 F. Supp. 2d at 207 ("[T]he mere allegation of mistreatment without the identification of a specific breached promise or obligation does not state a claim on which relief can be granted.").

This Court declines to grant Plaintiff the opportunity to amend her complaint to detail the specific policies and procedures that Defendants allegedly violated in connection with Plaintiff's involuntary withdrawal because Plaintiff cannot state a valid cause of action based on the alleged actions of Defendants in connection with her involuntary withdrawal, which, except for Dean Purpura's letter dated January 30, 1998, all occurred prior to January 29, 1998.  Although leave to amend should be "freely given when justice so requires," <u>see</u> Fed. R. Civ. P. 15(a), such leave need not be granted when amendment would be futile.  <u>Acito v. Imcera Group, Inc.</u>, 47 F.3d 47, 55 (2d Cir. 1995).

As to Plaintiff's claim that Defendants' involuntary withdrawal of Plaintiff on January 30, 1998 constituted a breach of her contract with AECOM, this is a claim for educational malpractice and is unsupportable.  Plaintiff contends that she:

> was informed by defendants in writing in or about June 1996 . . . that defendants would reconsider her reinstatement . . . if she agreed to admit in writing that she had a psychiatric illness, consented to defendants obtaining medical records from her treating physician and in connection with her voluntary admission to a hospital for a brief period, submitted to examination by a psychiatrist . . . [on the faculty of defendant AECOM and chosen by defendants to evaluate her], and signed a contract agreeing to hold the psychiatrist and defendants harmless and free from all liability and prior to the results of any evaluation.

(Am. Compl. ¶¶ 144-45.)

However, Defendants provide a copy of this "writing" which refutes most of Plaintiff's allegations. The letter, dated June 17, 1996, from Defendant Reichgott to Plaintiff, in pertinent part, states the Defendants' requirements of Plaintiff as:

1. You must present a written request to be reinstated to the curriculum.
2. The College must receive confirmation that your condition remains stable or continues to improve.
   a. At the time of your request for reinstatement, you must provide a written report from your treating psychiatrist describing your status. The therapist should advise us as to whether you have regularly attended therapy sessions; whether you have a realistic understanding of your illness; whether the treatment regimen is stable; and whether, in the opinion of the therapist, you are ready to undertake the emotional and academic responsibilities and stresses that will be associated with return to the clinical curriculum.
   b. You will be required to undergo independent evaluation by a Psychiatrist, selected by the College of Medicine, who will be asked to provide a written assessment to me and to the Committee on Student Promotions of the College. You will be required to sign a Consent and Authorization Form (copy attached) which will allow this administrative evaluation to be completed.
3. Based on the information received from your treating therapist and on the recommendations of the administrative evaluation, you may be required to remain in psychiatric treatment while in the College of Medicine. This would be with a therapist of your choice. In this circumstance, the Committee on Student Promotions will expect to receive, on a monthly basis, written reports documenting your attendance at therapeutic sessions and you will be required to authorize your therapist to provide such reports.

(Defs.' Notice of Mot. to Dismiss Ex. F.)

The attached Consent and Authorization Form states:

Consent and Authorization to Release Information:

I hereby consent to an evaluation by a psychiatrist chosen by the Albert Einstein College of Medicine (AECOM) of my fitness to reenter the medical school curriculum. I also hereby authorize this psychiatrist to provide a written report(s) of the evaluation to the AECOM Committee on Student Promotions, which report may include but is not necessarily limited to: information about diagnosis, treatment(s) past and present, response(s) to these treatments, prognosis, and information regarding my educational activities, rotations, etc. I understand that this report(s) will became [sic] part of the record of the Committee on Student Promotions.

I also authorize AECOM to provide the psychiatrist with necessary background information, including materials I have provided to AECOM concerning my clinical condition, to enable him/her to perform the evaluation.

I hereby release from liability and hold harmless the evaluating psychiatrist, the Committee on Student Promotions and staff and faculty of AECOM for any and all acts and omissions in connection with this administrative psychiatric evaluation.

(Id. (emphasis added).)

As shown by the June 17, 1996 letter and contrary to Plainitiff's allegations, Defendants did not require Plaintiff to: (1) admit in writing that she had a psychiatric illness; (2) consent to Defendants obtaining medical records from her treating physician; or (3) agree "to sign a contract to hold the psychiatrist and defendants harmless and free from all liability and prior to the results of any evaluation." (See Am. Compl. ¶ 144 (emphasis added).) In addition, the requirements contained in the June 17, 1996 letter are, as a matter of law, substantially in accordance with the reinstatement procedures for students on extended medical leave for psychiatric reasons, as stated in Appendix III: Guidelines for Academic Status of Students with Psychiatric Illness in AECOM's 1997-1998 Student Guide. (See Defs.' Notice of Mot. to Dismiss Ex. C at 28-29, ¶¶ 5-6.)[19]

---

[19] Appendix III: Guidelines for Academic Status of Students with Psychiatric Illness states that:
1. Students placed on extended medical leave for psychiatric reasons who wish to be considered for reinstatement, must consent and request that their treating psychiatrist inform the [Promotions] Committee: a) of attendance at therapeutic sessions; b) whether the student has a realistic understanding of his/her illness; and c) of the student's readiness to undergo the academic and emotional stresses of the medical curriculum if reinstated. The treating psychiatrist must also inform the Committee of the student's treatment regimen and attest that the regimen is stable.
1. Prior to reinstatement, the student must consent and be evaluated by a psychiatrist selected by the College of Medicine, who will report to the Committee as to the student's readiness to reenter the curriculum. The consent form shall provide that this evaluation is not confidential or privileged.
(Defs.' Notice of Mot. to Dismiss Ex. C at 28-29, ¶¶ 5-6.)
These reinstatement procedures apply because, as Plaintiff admits, Defendants stated that she had been placed on medical leave in May 1996 pursuant to AECOM's psychiatric policy. (Am. Compl. ¶ 294.)

Plaintiff refused to consent to Defendants' requirements (Am. Compl. ¶¶ 146-47), and in or about August 1997, "defendants recommended Plaintiff's involuntary withdrawal from defendant AECOM" (id. ¶ 112). In October 1997, Defendants "held a hearing concerning Plaintiff's appeal of the decision that she be involuntarily withdrawn."[20] (Id. ¶ 114.) Plaintiff then met with Dean Purpura on December 1, 1997 to appeal the Promotions Committee's determination of her involuntary withdrawal, and the Associate Dean, Dr. Deborah Kligler, was also present during this meeting.[21] (Id. ¶ 370.) In December 1997, Defendants informed

---

[20] Plaintiff alleges that "[o]n October 6, 1997 defendants illegally voted to recommend Plaintiff's involuntary withdrawal in a meeting in which, by design, Plaintiff was not permitted to fully participate, cross-examine or call witnesses, and at which defendants refused to answer questions or provide explanations." (Id. ¶ 369.) However, none of these "procedures" were required by 1997-1998 Student Guide submitted to this Court.

Appendix I: By-Laws of the Committee on Student Promotions provides the following procedures for decisions of the Promotions Committee recommending the withdrawal of students from AECOM:
1. Students may appeal the decision and recommendations of the [Promotions] Committee.
1. Appeals must be presented in writing to the Associate Dean for Students for transmittal to the Committee, within 10 days of receipt of notification of the Committee's decision.
1. The Associate Dean for Students will assist the student in the preparation of an appeal if requested to do so. He/She will assure that the student is notified of the date of the Committee meeting at which the appeal will be heard at least 7 days prior to that meeting.
1. If necessary, a Sub-committee of the Promotions Committee will be appointed to interview the student prior to the date of the meeting of the full Committee.
1. The student may appear with a faculty advisor, and may present up to three advocates from the faculty and/or student body.
(Defs.' Notice of Mot. to Dismiss Ex. C at 23, ¶ II.I.)

After the completion of this appeal process, final recommendations of the Promotions Committee are submitted to the Dean. "The Dean alone may withdraw a student permanently from the College of Medicine, therefore a decision made by the Committee in favor of withdrawal is effected as a recommendation from the Committee to the Dean." (Id. Ex. C at 19, ¶ II.D.)

[21] The applicable section of Appendix III: Guidelines for Academic Status of Students with Psychiatric Illness provides for an appeal of the Promotions Committee recommendation of withdrawal of a student who is on extended medical leave from AECOM. The procedures are as follows:
The student will be notified of the Committee's recommendation within 7 days and may appeal the recommendation of the Committee within 10 days of notification. Such appeal shall be by written statement to the Dean, who may affirm or overrule the Committee's decision or return the matter to the Committee for further inquiry.
(Id. at 29, ¶ 8.)

Plaintiff that they would reconsider her involuntary withdrawal on the same terms as presented to Plaintiff in June 1996 for reconsideration of her reinstatement, except, upon "the protests" of Plaintiff and her attorney, the psychiatric evaluation requirement was changed to permit Plaintiff "to choose from a list of 3 psychiatrists handpicked by defendants." (Id. ¶ 145.)  Plaintiff again refused to comply with AECOM's requirements (id. ¶ 146), which were substantially in accordance with its written policies and procedures.  Plaintiff based her refusal to consent and agree with AECOM's requirements on "the fact that Plaintiff had no treating physician, was unafflicted by mental illness, defect or disease, and that there was no question that Plaintiff was not properly admitted to the hospital during her brief stay in May 1996."[22] (Id. ¶¶ 146-47.)  Then, in or about January 30, 1998, Plaintiff received a letter from Dean Purpura, which finalized her involuntary withdrawal.  (Id. ¶¶ 116, 148.)

According to Plaintiff's allegations, as contradicted and supplemented by the applicable policies and procedures provided by Defendants and relied upon by Plaintiff in bringing her

Plaintiff did have the opportunity to appeal the decision of the Promotions Committee in October 1997 and in December 1997 to the Dean of AECOM.  (Am. Compl. ¶¶ 114, 370.)  The Am. Complaint does not allege that any of the procedures for an appeal of a decision of the Promotions Committee recommending withdrawal prior to the Promotions Committee's final decision or for an appeal of the Promotions Committee's recommendation that a student on extended medical leave should be withdrawn were violated by AECOM during her appeal.

[22] At oral argument, Plaintiff's counsel maintained that Plaintiff had been prepared to undergo the psychiatric evaluation, but was unwilling to sign a release and hold harmless the evaluating psychiatrist or AECOM for any result of that examination, a condition allegedly not contained within AECOM's policies and procedures.  (Tr. at 19, 35-36.)  Nevertheless, the Appendix III: Guidelines for Academic Status of Students with Psychiatric Illness, part of the 1997-1998 Student Guide, requires that a student on extended medical leave who wishes to be reinstated must consent to an evaluation by a psychiatrist selected by AECOM and the "consent form shall provide that this evaluation is not confidential or privileged."  (Defs.' Notice of Motion to Dismiss Ex. C at 29, ¶ 6.)  Although the 1997-1998 Student Guide does not state that the consent form would contain a hold harmless provision for the psychiatrist evaluating the student who had been placed on extended medical leave, such a provision is a necessary concomitant to a psychiatric evaluation which is "not confidential or privileged."

AECOM, as an academic institution serving hundreds of students, cannot be expected to provide for all of the minutiae concerning its internal policies and procedures in its Student Guide.  Under such circumstances, a limited hold harmless provision for the psychiatrist and the institution would be a reasonable and necessary adjunct to a "non confidential or privileged" psychiatric evaluation of Plaintiff by a non-treating psychiatrist and the use of such an evaluation by the administration of the institution.

claim, Defendants, as a matter of law, substantially followed their reinstatement, involuntary withdrawal, and appellate procedures in December 1997 and January 1998.[23]  Therefore, the Am. Complaint, as amended by the written documents referred to therein, presents an educational malpractice claim based on AECOM's "day-to-day implementation" of their policies and procedures, which is not a cognizable cause of action in this Court at this late date.  See Ansari, 1997 WL 257473, at *2; see also Gertler, 107 A.D.2d at 486.

Even if Plaintiff's allegations in connection with Defendants' involuntary withdrawal were treated as a breach of contract claim, Plaintiff could not maintain a breach of contract claim.  Plaintiff alleges that the January 30, 1998 letter, which finalized her involuntary withdrawal, prevented her from completing the requirements for reinstatement consideration. (Am. Compl. ¶ 148.)  However, as Plaintiff alleges, in December 1997, she refused to follow the 1997-1998 Student Guide's procedures for reinstatement, which she claims were part of her contract with Defendant AECOM.  See Gally, 22 F. Supp. 2d at 206 (stating that as part of the implied contract between a student and a university, the student has the obligation to comply with the university's procedures if she wishes to receive her degree).  By not complying with these procedures, Plaintiff breached her implied contract with AECOM in December 1997 and cannot maintain a valid contract claim against Defendants for its actions subsequent to her breach.

Plaintiff also claims that Defendant AECOM breached its contract with Plaintiff by not allowing her to review and correct all of her records after her involuntary withdrawal because AECOM's Bulletin, Student Guide, and Compendium provided that medical students who wish to review their AECOM records may do so upon request.  (Am. Compl. ¶ 124.)  The Am.

---

[23] These procedures are for persons placed on medical leave pursuant to AECOM's psychiatric policy.  (See Defs.' Notice of Mot. to Dismiss Ex. C at 28-29.)

Complaint, however, identifies no bulletin, student guide or compendium that allows a former student to correct AECOM's records. Again, Plaintiff does not identify any such specific promise or obligation made by AECOM. In addition, Plaintiff's contractual relationship with AECOM ceased with her involuntary withdrawal in January 1998, and therefore, AECOM's subsequent alleged actions preventing her from reviewing and correcting all of her records after January 30, 1998 do not provide a basis for a breach of contract claim. These claims are dismissed.

    2. Breach of Fiduciary Duty

Plaintiff's fourth cause of action for breach of contract and sixth cause of action for breach of fiduciary duty allege that Defendant AECOM breached its fiduciary duty to Plaintiff by not following certain accreditation requirements and requiring Plaintiff to participate in psychological examination, testing and treatment without her consent.[24] (Am. Compl. ¶¶ 219-23.) The Am. Complaint alleges that this fiduciary duty was created through AECOM's administration of financial aid programs in accordance with the Higher Education Act ("HEA") and its implementing regulations. (Id. ¶¶ 189-93.) This claim fails because the HEA and its regulations "create[] a fiduciary duty only between the institution and the government agency supplying the federal funding." Moy v. Adelphi Inst., 866 F. Supp. 696, 708 (E.D.N.Y. 1994); see also 34 C.F.R. § 668.82. Thus, the only fiduciary duty created by the HEA is a fiduciary duty to the disbursing governmental agency "to see that these funds are properly dispersed."

---

[24] The Am. Complaint also alleges that Defendants Olson, Bennett, David, and Reichgott breached their fiduciary duties to Plaintiff through their various actions. (Am. Compl. ¶¶ 204-16, 224-31.) However, the Am. Complaint does not allege sufficient facts to state a fiduciary relationship between Plaintiff and these Defendants. These Defendants are not alleged to have transacted business or handled money or property for the benefit of Plaintiff. See Black's Law Dictionary 625 (6th ed. 1990) (defining a person or institution as acting in a fiduciary capacity when "the business which he transacts, or the money or property which he handles, is not his own or for his own benefit, but for the benefit of another person . . . "). Therefore, these claims are also dismissed.

Moy, 866 F. Supp. at 708. As the HEA did not create a fiduciary duty by AECOM to Plaintiff, the Plaintiff's sixth claim is dismissed.[25]

### 3. Tortious Interference with Precontractual Relations

Plaintiff's ninth cause of action alleges tortious interference with precontractual relations and prospective economic advantage due to Defendants' alleged improper interference with her application for transfer to Albany Medical College, which was denied in February or March 1997, and her participation in an external graduation research project with Dr. Rennie, who provided a letter of recommendation for Plaintiff to Albany Medical College in January 1997. (Am. Compl. ¶¶ 250-63.)

The statute of limitations for a cause of action alleging tortious interference with precontractual relations and prospective economic advantage is three years. Demas v. Levitsky, 291 A.D.2d 653, 658, 738 N.Y.S.2d 402 (3d Dep't 2002) (citing Kronos, Inc. v. AVX Corp., 81 N.Y.2d 90 (N.Y. 1993)); N.Y. C.P.L.R. § 214(4). This case was filed on January 29, 2004, and therefore, any claims against Defendants for acts prior to January 29, 2001 are time barred. The allegations of tortious interference with precontractual relations involve acts committed by Defendants from 1995 to 1997, and thus, this claim is dismissed as untimely.[26]

---

[25] Plaintiff's eighth cause of action for accounting fails as well because under New York law a plaintiff must allege facts demonstrating either a fiduciary or a confidential relationship with a defendant to sustain an equitable action for accounting. Leveraged Leasing Admin. v. Pacificorp Capital, Inc., 87 F.3d 44, 49 (2d Cir. 1996). As the HEA did not create a fiduciary duty between Defendants and Plaintiff, and no facts showing any other fiduciary duty or confidential relationship are alleged, the claims for accounting fails. (See Am. Compl. ¶¶ 243-48.)

Additionally, Plaintiff's fourteenth cause of action for third-party beneficiary breach of contract relies on the HEA and is also dismissed. (See id. ¶¶ 318-22.) The Plaintiff cannot bring a suit to enforce any contract under the HEA because only the Secretary of Education may bring a suit under the HEA if the educational institution violates its duty. Moy, 866 F. Supp. at 708. To find a cause of action for a third-party beneficiary breach of contract claim based on the HEA would subvert the HEA by allowing, in effect, a private right action where one does not exist. See id.

[26] Plaintiff contends that the claims for tortious interference are not time barred because of the continuing violation doctrine. (Pl.'s Mem. at 22.) The Am. Complaint alleges that "Defendants' continuing refusal to correct Plaintiff's records is the direct and proximate cause of damages to Plaintiff,

4. Fraud

Plaintiff's tenth, eleventh, and twelfth causes of action allege fraud by the Defendants.

The tenth cause of action concerns various alleged statements by Defendant AECOM about their

medical program that induced Plaintiff to matriculate in August 1994. (Am. Compl. ¶¶ 265-75.)

The eleventh cause of action involves alleged statements, which occurred from 1995 to 1996, by

various Defendants about AECOM's Deceleration Program. (Id. ¶¶ 277-90.) The twelfth cause

of action alleges various statements by different Defendants concerning Plaintiff's placement on

medical leave and eventual involuntary withdrawal from AECOM, all occurring between 1996

and December 1997.[27] (Id. ¶¶ 292-308.)

Under New York law, a cause of action in fraud must be commenced within two years

from the time the fraud was discovered, or with the exercise of due diligence, should have been

discovered, or six years from the date the alleged fraud was committed, whichever is longer.

N.Y. C.P.L.R §§ 213(8), 203(g); Cappelli v. Berkshire Life Ins. Co., 276 A.D.2d 458, 458, 713

N.Y.S.2d 756, 757 (2d Dep't 2000). Plaintiff's claims of fraud are barred under either

---

resulting in missed opportunities to transfer to other M.D. degree granting institutions." (Am. Compl. ¶ 262.) However, tortious interference with a contract is not a continuing tort. Spinap Corp. v. Cafagno, 302 A.D.2d 588, 756 N.Y.S.2d 86 (2d Dep't 2003). Additionally, this allegation fails to state a cause of action for tortious interference with precontractual relations because Plaintiff does not allege interference with any specific contract she would have received but for Defendants failure to correct her records. See Gertler, 107 A.D.2d at 489-90 (stating that "New York recognizes a cause of action for interference with precontractual relations where a party would have received a contract but for the malicious, fraudulent and deceitful acts of a third party" (internal quotation marks and citation omitted)).

[27] Plaintiff alleges that the involuntary withdrawal, which occurred on January 30, 1998, was retaliation against her for "her complaints about mistreatment," but does not allege any fraud by Defendants on this date. (Am. Compl. ¶ 303(l).) Plaintiff's brief states that "[a]s alleged in the complaint, Defendants fraudulently withheld information from Ms. Radin regarding her appeal rights, and the proper procedure to be readmitted to AECOM, as late as February 1998, when her letters seeking an appeal of her involuntary withdrawal were returned to her unopened." (Pl.'s Mem. at 21.) Plaintiff has not articulated how the return of an unopened envelope by Defendants could constitute a "false representation of material existing fact," as required for an allegation of fraud. See American Home Assurance. Co. v. Gemma Constr. Co., 275 A.D.2d 616, 621, 713 N.Y.S. 2d 48 (1st Dep't 2000) (stating that under New York law, the elements of an allegation of fraud are "false representation of a material existing fact, scienter, deception and injury"). Additionally, the Am. Complaint does not include this allegation.

calculation. Plaintiff alleges that "[a]t the time the representations were made, Plaintiff did not

know the truth" (Am. Compl. ¶ 307), but Plaintiff must have, or should have, discovered any of

the alleged misrepresentations between the time of her matriculation in the fall of 1994 and her

her refusal to comply with AECOM's procedures for reinstatement in December 1997. Under

the two-year discovery rule, claims based on these actions would be untimely since the lawsuit

should have been commenced by December 1999 and was not commenced until January 29,

2004. Under the six-year statute of limitations, the three fraud causes of action are untimely

since all of the alleged fraudulent acts were committed prior to January 1, 1998.[28]

5. Violation of General Business Law § 349

Plaintiff's thirteenth cause of action alleges that Defendants violated New York State

General Business Law § 349 by their "misleading acts or practices" in connection with Plaintiff's

matriculation, Plaintiff's participation in the Deceleration Program, and the involuntary

withdrawal of Plaintiff from AECOM. (Id. ¶ 314.) Claims brought under New York State

General Business Law § 349 are subject to the three-year statute of limitations for causes of

action under C.P.L.R. § 214(2), and the cause of action accrues "when plaintiff has been injured

by a deceptive act or practice violating section 249." Gaidon v. Guardian Life Ins. Co. of

America, 96 N.Y.2d 201, 210 (N.Y. 2001). The last date upon which Plaintiff could have been

injured by a deceptive act or practice by the Defendants was on January 30, 1998, when the

---

[28] Plaintiff also contends that the fraud statute of limitations is tolled by the doctrines of
continuing violation and fraudulent concealment. (Pl.'s Mem. at 21.) The doctrines of continuing
violation and fraudulent concealment are inapplicable here because the Am. Complaint does not allege
any fraudulent acts occurring after December 1997. The Am. Complaint alleges that Defendants did not
allow Plaintiff to review all of her records (Am. Compl. ¶ 126 (emphasis added)) or correct all of her
records (id. ¶ 131 (emphasis added)) and that Defendants did not respond to inquiries about Plaintiff's
bills (id. ¶ 142). However, none of these allegations contain any fraudulent misrepresentations to Plaintiff
by Defendants.

Plaintiff was involuntarily withdrawn from AECOM. The three-year statute of limitations would have expired in January 2001, and, therefore, this claim is untimely.

     6. <u>Violation of New York State Human Rights Laws</u>

     Plaintiff's fifteenth cause of action alleges that Defendants' acts of suspending Plaintiff, placing Plaintiff on medical leave, refusing to grant Plaintiff the same opportunities and advantages as provided to white and Jewish medical students, and involuntarily withdrawing Plaintiff constituted discrimination in violation of New York's Executive Law § 296. (Am. Compl. ¶¶ 324-30.) The statute of limitations for violations of New York's Human Rights Law is three years. <u>See</u> <u>Quinn v. Green Tree Credit Corp.</u>, 159 F.3d 759, 765 (2d Cir. 1998) (citing N.Y. C.P.L.R. § 214(2)). In the employment discrimination context, a "claim accrues on the date that an adverse employment determination is made and communicated to the plaintiff." <u>Cordone v. Wilens & Baker, P.C.</u>, 286 A.D. 597, 598, 730 N.Y.S. 2d 89, 90 (1st Dep't 2001) (citing <u>Delaware State Coll. v. Ricks</u>, 449 U.S. 250, 258 (1980)). Since this action was filed on January 29, 2004, the cause of action must have accrued after January 29, 2001 to be timely. The claim for violation of § 296 is time barred because the cause of action accrued on or about January 30, 1998, when Plaintiff received a letter from Defendant AECOM, Purpura and Promotions Committee communicating AECOM's adverse determination that she was involuntarily withdrawn from the school.[29]

---

[29] Plaintiff argues that this claim has been tolled because of equitable tolling and the continuing violations doctrine. (Pl.'s Mem. at 14.) Plaintiff alleges that Defendants continue to discriminate in administering their policies concerning suspension and placement of students on medical leave. (Am. Compl. ¶¶ 324-29.) However, to establish a continuing violation a plaintiff must first point to a discriminatory act <u>against her</u> by defendants within the three-year statute of limitations period. <u>Pell v. Trustees of Columbia Univ.</u>, No. 97 Civ. 0193, 1998 WL 19989, *8 (S.D.N.Y. Jan. 21, 1998). "Completed acts such as a termination through discharge or resignation . . . are not acts of a continuing nature." <u>Malarkey v. Texaco, Inc.</u>, 559 F. Supp. 117, 121 (S.D.N.Y. 1982) (internal quotation marks and citation omitted), <u>aff'd</u>, 704 F.2d 674 (2d Cir. 1983) (per curiam). Since Plaintiff does not allege

7.  Violation of and Conspiracy to Violate RICO, 18 U.S.C. § 1961

Plaintiff's sixteenth cause of action alleges a civil RICO claim based on Defendants' acts to further five schemes, which were motivated by discrimination.  (Am. Compl. ¶¶ 332-44; Pl.'s Civil RICO Stmt.[30])  Civil RICO claims are subject to a four-year statute of limitations.[31] Agency Holding Corp. v. Malley-Duff & Assoc., Inc., 483 U.S. 143, 156 (1987).  The limitations period begins to run when plaintiff discovers or should have discovered her RICO injury.  Tho Dinh Tran v. Alphonse Hotel Corp., 281 F.3d 23, 35 (2d Cir. 2002).  Although Plaintiff does not allege what damages she suffered as a result of the Defendants' scheme or when she suffered these damages (see Am. Compl. ¶ 343), Plaintiff discovered her last possible RICO injury on or about January 30, 1998, when she received a letter notifying her of her involuntary withdrawal from AECOM.  Therefore, the statute of limitations ran as of January 30, 2002,[32] and this cause of action is dismissed as untimely.[33]

---

discriminatory acts against her after her involuntary withdrawal, the continuing violation doctrine is inapplicable.  Also, equitable tolling is inapplicable.  See infra pp. 37-38.

[30] Plaintiff's Civil RICO statement is not signed by an attorney of record as required under Rule 11(a) of the Federal Rules of Civil Procedure.

[31] Plaintiff cites pre-1987 district court case law to support her contention that the six-year statute of limitations for actions based on fraud applies to civil RICO actions.  (Pl.'s Mem. at 15 (citing Estee Lauder Inc. v. Harco Graphics, 621 F. Supp. 689 (S.D.N.Y. 1984) and Fustok v. Conticommodity, 618 F. Supp. 1076 (S.D.N.Y. 1985).)  However, these cases have been overruled by Agency Holding Corp. as to their holdings on the applicable statute of limitations for civil RICO claims.

[32] Plaintiff contends that the statute of limitations on her RICO claim is tolled because AECOM has engaged in fraudulent concealment to keep information from her.  (Pl.'s Mem. at 15.)  However, Plaintiff failed to plead any fraudulent concealment by Defendants in connection with her RICO claim. Furthermore, the Supreme Court has held that a plaintiff must have exercised reasonable diligence in attempting to discover her RICO claim to rely on the fraudulent concealment doctrine to toll the statute of limitations.  Klehr v. A.O. Smith Corp., 521 U.S. 179, 194-96 (1997).  Plaintiff knew or should have known of her last possible RICO injury when she was involuntarily withdrawn from Defendant AECOM.

[33] Plaintiff argues that her RICO claim is timely because (1) the "last date of injury" to her is unknown because AECOM has not provided her with a summary letter, which she argues should be provided to all students upon their withdrawal; (2) the last date of injury is June 2003; (3) "the statute of limitations runs from the last injury or last predicate act which is part of the same pattern of racketeering," citing Arab African Int'l Bank v. Epstein, 10 F.3d 168 (3d Cir. 1993).  (Pl.'s Mem. at 15.)

First, the Am. Complaint does not mention the summary letter, nor is it explained how this summary letter would constitute an additional RICO injury.  Next, the Am. Complaint alleges that in June

32

8. <u>Violation of Title IX and 42 U.S.C. § 1983</u>

Plaintiff's seventeenth cause of action claims violations of Title IX, the Fourteenth Amendment of the Constitution, and Title 42 of U.S.C. § 1983. (Am. Compl. ¶ 346.) Plaintiff asserts that AECOM has discriminated by allowing only white male students to simultaneously participate in the Deceleration Program and "in the [four]-year full academic load degree program to the extent that it would permit them to remain professionally competitive to obtain grant monies and choice residencies," while denying female medical students this same opportunity.[34] (Id. ¶ 351.) The Am. Complaint alleges that on January 3, 1997, October 6, 1997, and December 1, 1997, Plaintiff requested of Defendants AECOM, Reichgott and Promotions Committee that she be allowed to participate in "such a dual track program or prohibit her similarly-situated male classmate" from doing so and that these requests were denied "solely on the grounds that she is female and non-Jewish and her classmate was a white Jewish male." (Id. ¶ 355.) The Am. Complaint also alleges that on January 3, 1997, Plaintiff complained to Defendants AECOM, Reichgott and the Promotions Committee concerning "sexual harassment or hostile learning/work environment," which resulted from Defendants' refusal to permit her to apply for federal work study grants, to assign a faculty advisor to her, to create a deceleration program that would permit her "to represent her accomplishments in the same manner as her

_____

2003 Defendant Greenberg sent a letter in which he refused to explain Plaintiff's bills or provide her with a rent refund. (Am. Compl. ¶ 142.) There is no explanation of how this letter creates a RICO injury or alters when Plaintiff learned of her last possible RICO injury. The refusal to return money or explain the bills is not a new RICO injury. Lastly, the Supreme Court has expressly overruled the Third Circuit's last predicate rule. <u>Klehr</u>, 521 U.S. at 186-91. However, the Court did not decide the question of when a civil RICO action accrues. The Second Circuit has held that "each time a plaintiff suffers an injury caused by a violation . . ., a cause of action to recover damages based on that injury accrues to plaintiff at the time he discovered or should have discovered the injury." <u>Bankers Trust Co. v. Roades</u>, 859 F.2d 1096, 1102 (2d Cir. 1988). As none of Plaintiff's contentions alter the applicable statute of limitations, Plaintiff's RICO claim is untimely.

[34] Plaintiff also alleges that if a white male student failed an exam at AECOM, he would be given the information that would appear on the next exam to guarantee his passage of the exam and that female students never received this type of information. (Am. Compl. ¶¶ 353-54.) No facts are alleged to support these statements.

male, Jewish classmate," to allow her to make research applications, and to support her research. (Id. ¶ 356.)  Plaintiff further alleges that these violations of Title IX and § 1983 continued until her "similarly-situated younger, white, Orthodox-Jewish male classmate" took his licensing exam in June 2001.  (Id. ¶¶ 361-62.)

Although, Title IX does not contain a statute of limitations, district courts in the Second Circuit in New York have applied the three-year statute of limitations applicable to personal injury actions under N.Y. C.P.L.R. § 214(5).  Folkes v. New York Coll. of Osteopathic Med. of New York Inst. of Tech., 214 F. Supp. 2d 273, 287-88 (E.D.N.Y. 2002); Torre v. Columbia Univ., No. 97 Civ. 0981, 1998 WL 3686438, at *5 (S.D.N.Y. July 10, 1998) (citing Loren v. Feerick, No. 97 Civ. 3975, 1997 WL 441939 (S.D.N.Y. Aug. 6, 1997)), aff'd, 189 F.3d 462 (2d Cir. 1999); Benzo v. New York State Div. Of Human Rights, No. 95 Civ. 5562, 1997 WL 37961 (S.D.N.Y. Jan. 31, 1997), aff'd, 141 F.3d 1151 (2d Cir. 1998)).  The statute of limitations begins to accrue on the date the alleged discriminatory decision or action is made known to plaintiff. Torre, 1997 WL 37961, at *5.  Section 1983 claims are also subject to a three-year statute of limitations, which begins to accrue "when the plaintiff knows or has reason to know of the injury which is the basis of his action."  Pearl v. City of Long Beach, 296 F.3d 76, 80 (2d Cir. 2002) (citation omitted); Harris v. City of New York, 186 F.3d 243, 247-48 (2d Cir. 1999).[35]

Although this cause of action centers around actions taken by AECOM in regards to the "similarly-situated younger, white, Orthodox-Jewish male classmate," AECOM's last alleged act of gender discrimination against Plaintiff was the letter notifying her of her involuntary withdrawal on or about January 30, 1998.  Therefore, the claims under Title IX and § 1983 must

---

[35] Plaintiff asserts, without any legal support, that both her Title IX and § 1983 claims are subject to a six-year statute of limitations because of the alleged contractual rights granted to her by "AECOM's compendiums and student guide and strengthened by 34 C.F.R. § 668.15(b)(1)."  (Pl.'s Mem. at 10.)  The statute of limitations for claims under Title IX and under § 1983 is three years as stated above.

have been brought by January 30, 2001.  Since, these claims were not brought until January 29, 2004, these claims are untimely.[36]

Plaintiff attempts to avoid the consequences of the three-year statute of limitations for these claims by contending that her claims are timely under the continuing violation, equitable estoppel, and fraudulent concealment exceptions to the statute of limitations.[37]  (Pl.'s Mem. at 7-12.)  However, none of these exceptions are availing to Plaintiff because she was neither a student nor a suspended student after January 1998 and, thus, her Title IX and § 1983 claims are untimely.[38]

a.  Continuing Violation

To establish a continuing violation a plaintiff must first point to a discriminatory act against her by defendants within the three-year statute of limitations period.  Pell, 1998 WL 19989, at *8.  In this case, Plaintiff has failed to allege any discriminatory act against her at any time since January 30, 1998, let alone within the three years prior to filing this complaint.  Plaintiff contends that the alleged discriminatory acts that serve as the basis for her complaint, without identifying any specific act, remain unremedied and, therefore, these acts would fall

---

[36] Additionally, the Am. Complaint fails to state a valid cause of action for claims under the Fourteenth Amendment and § 1983 because these causes of action require state action by the Defendant. Ciambriello v. County of Nassau, 292 F.3d 307, 323 (2d Cir. 2002); Kraft v. Yeshiva Univ., No. 00 Civ. 4899, 2001 WL 1191003, at *3 (S.D.N.Y. Oct. 5, 2001).  Plaintiff alleges that Defendants AECOM and Yeshiva are private, not-for-profit institutions of higher education, (Am. Compl. ¶¶ 7, 9), and has not alleged any facts to establish state action.  A school's receipt of federal or state funding does not necessarily make a school or its employees state actors.  Rendell-Baker v. Kohn, 457 U.S. 830, 833-43 (1982); Kraft, 2001 WL 1191003, at *3.

[37] Plaintiff also contends that the doctrine of "adverse domination" tolls the statute of limitations in her case. (Pl.'s Mem. at 12 (citing Moviecolor Ltd. v. Eastman Kodak Co., 288 F.2d 80, 88 (2d Cir. 1961), cert. denied, 368 U.S. 821 (1961).)  However, this doctrine is inapplicable in this case.  It applies where the plaintiff is a corporate entity, and the defendant wrongfully obtains domination and control of the plaintiff entity's directors or officers, who then act in the defendant's interest rather than for all its stockholders.  Moviecolor Ltd., 288 F.2d at 88.

[38] From the Am. Complaint, it is unclear whether Plaintiff's eighteenth cause of action for retaliation is in connection with her federal or state discrimination claims.  Regardless, this cause of action is dismissed because all of the state and federal discrimination claims are time barred.

within the limitations period. (Pl.'s Mem. at 8-9.) Plaintiff's argument fails because "completed acts," such as a plaintiff's termination from the allegedly discriminatory employment or similar situation, are not acts of a continuing nature. <u>Malarkey</u>, 559 F. Supp. at 121; <u>see also</u> <u>Aggarwal v. New York City Health and Hosp. Corp.</u>, No. 98 Civ. 5063, 2000 WL 172787, at *4 (S.D.N.Y. Feb. 10, 2000); <u>Pell</u>, 1998 WL 19989, at *8. Therefore, Plaintiff's involuntary withdrawal from Defendant AECOM is not an act of a continuing nature.

Even assuming Plaintiff could present a timely discriminatory act, a continuing violation will only be found where: (1) "there is proof of specific ongoing discriminatory policies or practices," or (2) "specific and related instances of discrimination are permitted by the [defendant] to continue unremedied for so long as to amount to a discriminatory policy or practice." <u>Cornwell v. Robinson</u>, 23 F.3d 694, 704 (2d Cir. 1994). To determine whether the plaintiff has established a continuing violation, courts in the Second Circuit have used the three factors set out in <u>Berry v. Bd. of Supervisors of La. State Univ.</u>, 715 F.2d 971 (5th Cir. 1983): "the 'relatedness' of the various discriminatory acts, their frequency, and the 'degree of permanence.'" <u>Folkes</u>, 214 F. Supp. 2d at 290 (quoting <u>Berry</u>, 715 F.2d at 981-82). The last factor "acts essentially as a notice requirement. When discriminatory acts are of such a duration and form as to place the employee on notice of their discriminatory effect, a duty is created to assert one's rights." <u>Folkes</u>, 214 F. Supp. 2d at 290 (internal quotation marks and citation omitted).

In this case, Plaintiff alleges, in relation to her Title IX and § 1983 claims, that Defendants continued to discriminate with respect to the Deceleration Program, assisting students to obtain federal grants and supporting research until June 2001, when a "similarly-situated younger, white, Orthodox-Jewish male classmate would have taken" a certain exam.

(Am. Compl. ¶ 362.)  Plaintiff was aware of these allegedly discriminatory acts prior to her

involuntary termination in January 1998 because she had complained to Defendants about

discrimination on three separate occasions in 1997.  (See id. ¶ 355.)  Thus, having notice,

Plaintiff had a duty to assert her rights by filing a claim within 3 years, and she failed to do so.

Therefore, this exception to the statute of limitations is inapplicable.

b.  Equitable Estoppel

Additionally, Plaintiff claims that the doctrine of equitable estoppel is applicable.  (Pl.'s

Mem. at 10-11.)  Equitable estoppel is a defense which "works to prevent a defendant from

asserting the statute of limitations as a defense where 'the plaintiff knew of the existence of a

cause of action but the defendant's conduct caused the plaintiff to delay the bringing of a

lawsuit.'"  Pell, 1998 WL 19989, at *7 (quoting Buttry v. Gen. Signal Corp., 68 F.3d 1488, 1493

(2d Cir. 1995)).  The Am. Complaint does not allege any conduct by Defendants that would have

caused Plaintiff to delay bringing this lawsuit, such as misrepresentation or any fraudulent acts of

concealment.  In her Memorandum of Law in Opposition to Defendants' Motion to Dismiss,

Plaintiff claims Defendants misled her into believing that she could appeal her withdrawal to the

Board of Trustees.  (Pl.'s Mem. at 10.)  However, this is not alleged in the Am. Complaint.

Therefore, Plaintiff presents no allegations supporting the application of equitable estoppel.

c.  Equitable Tolling

Equitable tolling (fraudulent concealment) "only 'prevents the running of a statute of

limitations against the plaintiff who is unaware that he [or she] has a cause of action because of

the defendant's fraudulent acts of concealment.'"  Pell, 1998 WL 19989, at *8 (quoting Bennett

v. United States Lines, 64 F.3d 62, 66 (2d Cir. 1995)).  When a plaintiff is "acutely aware" of the

acts she alleges to be discriminatory, this doctrine may not be applied to toll the statute of

limitations. Id. Again, not only was Plaintiff aware of the alleged discriminatory acts, but she also brought her allegations of discrimination to the attention of the Promotions Committee on three separate occasions in 1997. (Am. Compl. ¶ 355.) Therefore, the equitable tolling doctrine is inapplicable to this case.

**CONCLUSION**

For the foregoing reasons, the motion to dismiss is granted. Enter judgment for the Defendants.

IT IS SO ORDERED.

Dated: New York, New York
May **20**, 2005

Robert P. Patterson, Jr.
U.S.D.J.

Copies of this Opinion and Order sent to:

*Counsel for Plaintiff*
Eric S. Pennington, P.C.
1 Gateway Center, Suite 105
Newark, New Jersey 070102
By:     Eric S. Pennington
Tel:    973-639-0600
Fax:    973-639-9898

*Counsel for Defendants*
Sive, Paget & Riesel, P.C.
460 Park Avenue
New York, New York 10022
By:     Daniel Riesel
        Kate Sinding
Tel:    212-421-2150
Fax:    212-421-2035